UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
UNIVERSAL BONDING INSURANCE
COMPANY,

                  Plaintiff,

      - against -

BAY PROPERTY ASSOCIATES,
JONATHAN EICHNER,
JPMORGAN CHASE BANK, N.A.,
BROOKMAR DEVELOPMENT CORP.,
ON THE BEACH ENTERTAINMENT, LLC,
WESTSHORE 480 DEVELOPMENT LLC,
and THE CITY OF NEW YORK,

                  Defendants.
----------------------------------------------------------------X

Case Number: CV- 09-10030
(FM)

## **MEMORANDUM OF LAW**

**RUSS & RUSS, PC**
Attorneys for Defendants
On The Beach Entertainment, LLC,
a Court-appointed receiver of
Brookmar Corp. ("Brookmar"),
and assignee of the claims of Defendants,
Bay Property Associates and Jonathan Eichner
543 Broadway
Massapequa, NY 11758
516-541-1014

## **TABLE OF CONTENTS**

FACTUAL BACKGROUND................................................................................................1

ARGUMENT.....................................................................................................................9

    Point I:  The Recovery: Principal includes all earnings; interest follows the
principal..........................................................................................................................9

    Point II:  The surety is a trustee as to the principal, interest and earnings constituting the
Cash................................................................................................................................12

    Point III:  The surety first earned money market interest, and later, income in the
investment portfolio........................................................................................................13

    Point IV:  Disgorgement of the Cash..............................................................................14

    Point V:  The surety is not entitled to recover counsel fees and expenses............................16

    Point VI:  The surety is not entitled to recover allegedly due bond premium.........................18

CONCLUSION..................................................................................................................19

# TABLE OF AUTHORITIES

**Cases**

Bio-Rad Labs., Inc. v. Nicolet Instrument Corp., 807 F.2d 964 (Fed. Cir.1986)..........................15

Birnbaum v. Birnbaum, 73 N.Y.2d 461, 539 N.E.2d 574, 541 N.Y.S.2d 746 (1989),
      rearg denied, 74 N.Y.2d 843, 545 N.E.2d 873, 546 N.Y.S.2d 559 (1989).......................13

Boyce v. National Commercial Bank & Trust Co., 41 Misc.2d 1071, 247 N.Y.S.2d 521
      (Sup. Ct. Albany Co. 1964), aff'd 22 A.D.2d 848,
      254 N.Y.S.2d 127 (3 Dep't 1964) ..................................................................................18

General Motors Corp. v. Devex Corp., 461 U.S. 648 (1983).........................................................15

In re Berrian, 44 How. Pr. 216 (1876).............................................................................................12

Kearns v. Chrysler Corp., 32 F.3d 1541 (Fed. Cir. 1994)..............................................................15

Mars, Inc. v. Coin Acceptors, Inc., 513 F.Supp.2d 128 (D.N.J. 2007)..........................................15

Matter of Heller, 6 N.Y.3d 649, 849 N.E.2d 262, 816 N.Y.S.2d 403 (2006)................................13

Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545 (1928).............................................................13

Mercury Bay Boating Club Inc. v. San Diego Yacht Club, 76 N.Y.2d 256, 557 N.E.2d 87,
      557 N.Y.S.2d 851 (1990).............................................................................................13

Paper Converting Mach. Co. v. Magna-Graphics Corp., 745 F.2d 11 (Fed. Cir. 1984)................15

Phillips v. Washington Legal Foundation, 524 U.S. 156, 118 S.Ct. 1925,
      141 L.Ed.2d 174 (1998) ...............................................................................................12

Polaroid Corp. v. Eastman Kodak Co., 16 U.S.P.Q.2d 1481 (D. Mass. 1990)..............................15

Sands v. Runyon, 28 F.3d 1323 (2d Cir. 1994) ..............................................................................16

Stuarco, Inc. v. Slafbro Realty Corp., 30 A.D.2d 80, 289 N.Y.S.2d 883 (2d Dep't 1968),
      lv. denied, 22 N.Y.2d 645, 295 N.Y.S.2d 1027, 242 N.E.2d 493 (1968).........................12

**Statutes**

Fed. R. Civ. P. 22............................................................................................................................18

N.Y. C.P.L.R. 213............................................................................................................................18

Title 28, USC 1335...................................................................................................18

**Treatises**

Restatement (Second) of Trusts § 170 (1).................................................................13

FACTUAL BACKBROUND

This case involves the recovery of cash collateral securing three (3) New York City ("City") sewer-related bonds from a surety in liquidation in Illinois, which still holds the cash and compounded interest and investment return (together "Cash") after fourteen (14) years, despite the absence of any exposure to, or claims against, the bonds and demands for release. See Complaint, Document No. 1, Exhibit "A." The surety's complaint contains affirmative claims to the Cash and seeks to bar the claims of all of the defendants; more recently, however, counsel to the surety has asserted that the surety is "trying to get rid of" the Cash.[1]

The surety maintained the Cash in two (2) money market accounts from December 1996 until 2004, and then in its investment portfolio, growing it in a variety of investment vehicles. Exhibit "K," pp. 35-39. The surety books the Cash as an asset, and has refused to disgorge any of the Cash, despite repeated demands by Defendant, BROOKMAR DEVELOPMENT CORP. ("BROOKMAR"), and despite the surety's receipt of two (2) critical letters, evidencing that 1) there would not be any claim against the bonds by the City, the party to whom the bonds run, and 2) that BROOKMAR was the real party in interest as to the Cash. See Exhibits "L," and "M," respectively.

The recovery herein is for the benefit of both Defendant, ON THE BEACH ENTERTAINMENT, LLC ("OTBE"), a New York State Court-appointed Receiver of BROOKMAR, to the extent of sixty-five (65%) percent, and Defendant, BAY PROPERTY ASSOCIATES ("BAY"), the originally-named principal on the bonds, to the extent of thirty-five (35%) percent. This results from the successful mediation before Magistrate Judge Peck, at which time BAY and Defendant, JONATHAN EICHNER ("EICHNER"), its General Partner, assigned to OTBE all claims of BAY and EICHNER. Thus, OTBE, BROOKMAR, BAY and

---

[1] Statement of Vincent Zichello Esq., in open Court on October 26, 2010.

EICHNER ("CLAIMANTS") are unified in securing this recovery.   See transcript of the settlement conference setting forth the Sharing Agreement, Exhibit "N".

On October 8, 2010, at the mediation, Magistrate Judge Peck noted that "Universal brought this suit to determine who among those claimants is owed that money," and that based on the parties' sharing agreement, "there is now no dispute that Universal owes money to the defendants as a group, but it only disputes the amount of that money." Exhibit "N."  Actually, however, the surety brought this suit to retain the Cash and bar the claims of the defendants, as established by specific allegations in the Complaint, later cited herein. See Complaint, Document No. 1, Exhibit "A."  This is relevant to CLAIMANTS' defense to the surety's request to be awarded counsel fees and expenses.

The three (3) remaining issues in this case are: 1) the amount of the recovery, and, 2) whether the surety can belatedly recover judgment for unbilled (and, we argue, unearned and time-barred) allegedly due bond premium, and if so, against whom, and whether the surety may claim that as an offset, and 3) whether the surety can recover legal fees and expenses arising from this litigation (despite the fact that surety brought this action seeking to retain the Cash and earnings and bar adverse claims thereto), and if so, against whom, and whether the surety may claim that as an offset.

The amount of CLAIMANTS' recovery should be based upon the surety's actual retention, use, and investment of the Cash for the past fourteen (14) years.  CLAIMANTS have the surety's records of money market interest earned on the Cash, from December 1996 until mid 2004, as well as the investment return on the Cash, from mid 2004 to the end of 2009. See Exhibits "O" and "P."  CLAIMANTS also have the testimony of the surety's accountant, Mr. Raymond Jilek. Exhibit "K."  The surety has had the interest and income upon which it could

earn further interest and income.   CLAIMANTS calculate the principal ($491,250.00) with interest and income to total approximately $941,466.00 as of December 31, 2010, with a per month accrual of $3,138.00 during 2011.   CLAIMANTS provide the Court with the affidavit of Edmund H. Mantell Ph.D, economist, supporting the compounding of interest and income.

The calculation is consistent with the Collateral Security Receipt and Agreement, between the surety and BAY, undated, ("Collateral Agreement"), which defines "collateral" as including earnings on the principal; in that agreement, the surety is contractually-bound to disgorge earnings because earnings form part of the principal and collateral. Exhibit "Q."  The Collateral Agreement clearly requires the surety to "...within a reasonable time, return said collateral security or the proceeds thereof less any deductions pursuant to the terms of this agreement, to the party then designated as Owner." Exhibit "Q."  BAY is the original owner. Exhibit "Q."  The surety made no effort, whatsoever, over fourteen (14) years, to return the Cash to BAY.

The factual background is as follows.  OTBE is the judgment creditor of non-party, Brad Zackson ("Zackson").   Zackson was a prominent real estate developer and the principal and President of BROOKMAR. See, Deposition of Brad Zackson, November 1, 2010, Exhibit "R," pp. 16-17, 21.  As a result of money judgments entered by confession by OTBE against Zackson, and a certain CPLR Article 52 "turnover proceeding" in New York County Supreme Court, OTBE, with Zackson's consent, was appointed Receiver of BROOKMAR. See, Order, Exhibit "S."

During the 1980s and early 1990s, BAY was engaged in the development of a parcel of real estate located at 4302-4322 West Shore Avenue and 1926 Shore Parkway, Brooklyn (the "Project"). See, Deposition of Jonathan Eichner, July 26, 2010, Exhibit "T," p. 10. On or about

October 1, 1987, BAY and Defendant, JP MORGAN CHASE BANK, N.A. ("CHASE"), entered into agreements, including a building loan agreement, by which CHASE made construction loans to BAY of at least $9,898,000.00, additional loans, and provided letters of credit, all of which were secured by mortgages covering the Project. Exhibit "U." EICHNER provided CHASE with a general indemnity. Exhibit "T," p. 21; Exhibit "V."

BAY sought the assistance of CHASE in BAY'S efforts to secure sewer-related bonds securing the City that the sewers would be completed. Exhibit "T," p. 29-33.  Through Breitstone & Co, LTD of Cedarhurst, New York ("Breitstone"), a broker, BAY applied for and obtained three (3) performance sewer-related bonds for the benefit of the City, assuring the construction and completion of sewers ("Sewer Bonds"). Exhibit "T," p. 36; Exhibit "W."  The Sewer Bonds were obtained from Plaintiff, UNIVERSAL BONDING INSURANCE COMPANY, (later acquired by Kemper, a trade name of Lumberman's hereinafter, "surety"). See, Order approving acquisition, Exhibit "X."  In obtaining those Sewer Bonds running to the City, BAY posted a $500,000.00 CHASE irrevocable letter of credit ("LOC") as collateral with the surety, and CHASE and BAY executed and delivered the Collateral Agreement.  See, Exhibit "T," p. 29-33; Exhibit "Y."

During the early 1990s, BAY became insolvent and both BAY and EICNHER defaulted on their extensive obligations to CHASE. Exhibit "T," pp. 18-19, 26-28, 53-56.   CHASE foreclosed and took over the Project, taking title in the name of a CHASE entity, Bay 43rd Street Corp. ("43rd"), by referee's deed, dated November 25, 1992 recorded December 31, 1992. See, Exhibit "Z."  BAY ceased operations, and EICHNER filed for bankruptcy in Florida and was discharged. Exhibit "T," pp. 18, 53-56.

BAY and EICHNER made no claim to the Cash. They and had nothing further to do with the events or facts of this case until they were served with the Summons and Complaint. Exhibit "T," pp. 68-69.

CHASE paid Sewer Bond premium to the surety. They remained in the name of BAY. On December 6, 1993, CHASE'S subsidiary, 43rd, as Seller, entered into an agreement with BROOKMAR, as purchaser, for the sale of the Project. Exhibit "AA." On May 17, 1994, CHASE and BROOKMAR entered into another agreement regarding completion of the Project and sewers, which agreement concerned the LOC ("WHEREAS, Chase and Purchaser desire to enter into this Agreement with respect to the completion of the Work covered by the Bonds and to arrange for the release of the Letter of Credit"). Exhibit "BB." The Project was sold by CHASE, through the subsidiary, 43rd, to BROOKMAR, by deed dated May 17, 1994. Exhibit "CC."

Despite the sale to BROOKMAR, CHASE remained exposed to the surety pursuant to the LOC, and covered that exposure by procuring from BROOKMAR a cash escrow of $950,000.00. Exhibit "DD." The Escrow Agreement, dated May 17, 1994, described the $950,000.00 as the "Completion Escrow." Exhibit "DD." The Escrow Agreement provides that if a drawdown of the CHASE LOC securing the Sewer Bonds should occur, CHASE would be authorized to make a withdrawal from the BROOKMAR Completion Escrow in the amount of the drawdown of the LOC. Exhibit "DD." The Escrow Agreement also provided that "upon the full release of the Letter of Credit (and/or the return to Chase of all funds that shall have been drawn upon under the Letter of Credit from and after the date hereof) … Purchaser may, by notice to Chase, direct Chase, as escrow agent, to release to Purchaser the remaining amounts of the Completion Escrow…" Exhibit "DD."

In March of 1994, BROOKMAR'S attorney, Nelson Braff, Esq of Jacobs, Zinns, Schneyer & Braff, P.C. corresponded with the surety, advising the surety that BROOKMAR was purchasing the Project. Exhibit "EE." The May 17, 1994 agreement between CHASE and BROOKMAR further provided that if there was no drawdown on the LOC, then once the work was complete and accepted by the City, CHASE "shall release funds to Purchaser (BROOKMAR)..." Exhibit "BB," p. 5.  BROOKMAR, as the new owner of the Project, became responsible to CHASE for the Sewer Bonds and CHASE's exposure to UNIVERSAL under the LOC. Exhibit "BB."

By letter dated April 16, 1996, CHASE informed the surety that the LOC would not be renewed and that, to the extent funds under the LOC were drawn down, any rights of the original principal, BAY, to those funds were transferred to BROOKMAR. Exhibit "M."

On April 29, 1996, the surety corresponded directly with the City to determine the status of the Project. On August 19, 1996, BROOKMAR corresponded with the City indicating that BROOKMAR had no intention of moving forward with the Project. Exhibit "FF."

CHASE instructed the surety, in writing in 1996 that UNIVERSAL should return the Cash to BROOKMAR. Exhibit "M."  By letter dated August 19, 1996, BROOKMAR notified the relevant City agency, the New York City Department of Environmental Protection ("DEP"), that the sewer had been abandoned, that BROOKMAR had no intention of moving forward on the Project, and requested that the DEP release the Sewer Bonds. Exhibit "GG."  To obtain the release, the DEP required BROOKMAR to weld and seal the portions of the sewers that had been constructed at the Project. Exhibit "R," pp. 143-144.  BROOKMAR also agreed to indemnify and hold harmless the City and the DEP for any claims or damages resulting from the

incomplete and unconstructed sewers at the Project.   BROOKMAR complied with these requests. Exhibit "R," p. 144.

On August 29, 1996, Paul Tramontana, BROOKMAR'S CFO, corresponded with the surety, stating "we have been informed by Chase Manhattan Bank, holder of the letter of credit, that they have released the balance of our escrow funds to you.  These funds total $491,250.00." Exhibit "HH."  On September 30, 1996, BROOKMAR executed an Indemnification and Hold Harmless in favor of the City regarding the sewers. Exhibit "II."  On October 9, 1996, the City corresponded with BROOKMAR and the surety, acknowledging receipt of the Indemnification and Hold Harmless, and acknowledging "...the satisfactory completion of field work as was required by DEP to secure the abandoned private sewer drains," and stated that DEP "hereby has no objection to the release of said performance bond as of July 1, 1996." Exhibit "L."  The letter from the City was consistent with the general form of release letters requested by the surety. See, form release letter, Exhibit "JJ."

In 1992 and 1993 the surety drew down the LOC for Sewer Bond premiums totaling $8,750, leaving an LOC balance of $491,250. Exhibit "KK."  Also during 1996, the surety generated documents to draw down the remaining balance of the LOC, $491,250.00 but stopped the drawdown. Exhibit "LL."

**By letter dated October 9, 1996, the DEP stated, "Based on the submitted documents, and the satisfactory completion of field work as was required by DEP to secure the abandoned private drains, the Department of Environmental Protection hereby has no objection to the release of said performance bond as of July 1st, 1996."[2]** Exhibit "L."

---

[2] The letter was sent by a senior DEP official, Magdi Farag, P.E., Director of Engineering, Bureau of Water and Sewer Operations, Department of Environmental Protection

As aforesaid, documents show that during 1996, the surety issued documents to drawdown the LOC but reversed its decision to do so. Exhibit "LL." **However, in December of 1996, the surety drew down the LOC for the balance of $491,250.00.** Exhibit "MM." The surety knew at that time that BROOKMAR had provided "escrow funds" to CHASE protecting CHASE against the drawdown of the LOC. Exhibit "DD." At that time, the surety knew that the City had consented to the release of the Sewer Bonds and that there could never be a claim against the Sewer Bonds. Exhibit "L."

The Project suffered setbacks and financial problems and was eventually sold, incomplete, by BROOKMAR to Defendant, WESTSHORE 480 DEVELOPMENT, LLC ("WESTSHORE"). Exhibit "R," pp. 42-43, 137-138. BROOKMAR expressly retained all rights to recover the Cash. Exhibit "NN." BROOKMAR'S counsel, Morris Barenbaum, Esq., corresponded with the surety in March 2005, and the surety responded on April 21, 2005, stating that "...we do not have a paper file nor any electronic data for your client. When Kemper Insurance Company took over Universal Bonding Company last year, this file was not handed over to us." Exhibit "OO."

The surety demanded that BROOKMAR procure from the City, a formal written form of general release. Exhibit "OO." In an agreement between WESTSHORE and BROOKMAR, dated December 24, 2007, WESTSHORE represented that it was working with the DEP in order to release the surety under the Sewer Bonds. Exhibit "NN." The agreement provided that all monies paid by the surety to WESTSHORE would be turned over to BROOKMAR. Exhibit "NN."

BROOKMAR and ZACKSON suffered financial difficulties. Exhibit "R," pp. 137-138. After OTBE was appointed as BROOKMAR's Receiver in 2009, Russ & Russ PC, counsel for

OTBE corresponded with the surety to release the Cash. Unsuccessful, OTBE'S counsel indicated that an action would be commenced in New York State Supreme Court. The surety commenced this action for a declaratory judgment, seeking to retain the Cash and bar adverse claims, and alternatively, to recover allegedly due bond premium and counsel fees and expenses. See, Complaint, Document No. 1, Exhibit "A.

ARGUMENT

POINT I

THE RECOVERY: PRINCIPAL INCLUDES ALL EARNINGS
INTEREST FOLLOWS THE PRINCIPAL

CLAIMANTS are entitled to recover the Cash. BAY has contractually-based rights against the surety pursuant to the Collateral Agreement. OTBE, as Receiver, of BROOKMAR, has those rights pursuant to the doctrines of assignment, equitable assignment and novation. CLAIMANTS are advancing their rights in a unified manner, but the fact remains that BROOKMAR can track its cash of $950,000.00 from the Completion Escrow with CHASE, to CHASE, and in turn, from CHASE through the LOC, to the surety. After the foreclosure of BAY and the takeover of the Project by CHASE and its subsidiary, 43rd, the surety accepted CHASE as the real party in interest as to the Sewer Bonds and collateral security.. Upon the sale to BROOKMAR, BROOKMAR, become the real party in interest as to the Sewer Bonds and collateral security. Beyond that, CHASE expressly informed the surety that BROOKMAR was the real party in interest. This case does not involve the question of whether or not the surety could ever have been liable under the Sewer Bonds, because the surety was released by the City in 1996, even before the LOC was drawn and became principal in the hands of the surety. Exhibit "L."

The Collateral Agreement expressly states, **"the collateral security, together with income thereon"** is pledged and deposited with the surety.  Although it also states that "surety shall pay no interest on the collateral security, and assume no responsibility for the earning of any income thereo,." Exhibit "Q," CLAIMANTS submit that the two clauses are entirely consistent.  The surety is not, independently, obligated to pay interest on principal, but in the event that interest or income is actually earned, then the earnings are part of the principal and the collateral.  This is, in fact, the way that the surety reads and administers the agreement, as confirmed by the deposition of Steven Squattrito, surety manager. Exhibit "PP."

Mr. Squattrito testified that as a matter of practice, when the surety releases cash collateral, the earnings are also released by the surety, provided that a fully signed and properly executed IRS Form W-9 is on file. See Deposition of S. Squattrito, dated November 19, 2010, Exhibit "PP," pp. 12-13.  Contrary to that practice, Mr. Squattrito opined that the surety would not pay interest in this case, based upon the lack of a W-9, together with the language in the Collateral Agreement stating that the surety shall not **pay** interest. Exhibit "PP," pp. 14, 19.  Significantly, when questioned further, Mr. Squattrito responded that he believed that the "shall pay no interest" provision was irrelevant, and did not mean that the surety cannot earn interest, and agreed that the surety did not have the right to keep earned interest or income. Exhibit "PP," pp. 26-28, 30.

Mr. Squattrito tied the refusal to pay interest or income in this case solely to the lack of a W-9 form, stating: "it was commonplace, then, if the original form of collateral was cash to, if the depositor provided us with a properly executed W9, then to view this collateral as one in which interest would be earned and payable to the depositor." Exhibit "PP," p. 38.  In such a

case, a check would be issued reflecting principal plus accrued interest that would be payable to the depositor. Exhibit "PP," p. 39.

Mr. Squattrito also admitted that there were other similar instances when depositors had requested interest or income on their cash collateral, but that they were denied interest due to the lack of a W9 form on file with the surety. However, if they had sent a W9 form, interest and income would have been sent to them.

> Q.    In the last six years, I think you told me there were approximately ten occasions where people requested interest or income on their cash collateral. I believe you told me that in each case you said to them, "We don't have an executed W9 in our file; but if you have one, send one in," and then none of the people sent one in.
>
> A.   Correct.
>
> Q.   What I'm asking you is, did you also tell those approximate ten people that they had no entitlement to interest or income because of a sentence in the collateral security agreement?
>
> A.   Probably so. It's not uncommon to given a lapse of time and often the people I'm dealing with are second or third generation. Some of this collateral, as is the case here, is dated and it goes back a number of years and I'm more than willing to, number one, share the documents and, number two, go through it with them or their attorney or whomever and discuss that.
>
> Q.   <u>If all ten of them had, in fact, sent you W9s in proper form, executed, would you have calculated interest and income and sent it to them?</u>
>
> A.   <u>Yes, sir.</u>

Exhibit "PP," pp. 57-58 (emphasis added).

The lack of a W9 form is no justification for retention of earnings on cash collateral. The presentation of a W9 form is a minor, ministerial task. CLAIMANTS were never asked to sign

and submit W9 forms.   The Complaint does not demand these forms.   In any event, CLAIMANTS are prepared to provide same.

The agreement comports with the long recognized common law rule that interest follows principal. See, <u>Phillips v. Washington Legal Foundation</u>, 524 U.S. 156, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998) ("The rule that 'interest follows principal' has been established under English common law since at least the mid-1700's. <u>Beckford v. Tobin</u>, 1 Ves.Sen. 308, 310, 27 Eng.Rep. 1049, 1051 (Ch. 1749) ('Interest shall follow the principal, as the shadow the body'). Not surprisingly, this rule has become firmly embedded in the common law of the various States."

In <u>In re Berrian</u>, 44 How. Pr. 216 (1876), the New York Court of Appeals held that "by the uniform decisions of our state courts, interest follows the principal as soon as due."  More recently, the Appellate Division reasserted this maxim in <u>Stuarco, Inc. v. Slafbro Realty Corp.</u>, 30 A.D.2d 80, 289 N.Y.S.2d 883 (2d Dep't 1968), lv. denied, 22 N.Y.2d 645, 295 N.Y.S.2d 1027, 242 N.E.2d 493 (1968), holding the plaintiff was "entitled to the interest actually accrued …despite the absence of any agreement to pay interest on the deposit, and this precisely and only because interest was in fact earned thereon" (emphasis added).

POINT II

THE SURETY IS A TRUSTEE AS TO THE PRINCIPAL,
<u>INTEREST AND EARNINGS CONSTITUTING THE CASH</u>

By the surety's own documentation, the Cash is the res of a trust.  The surety describes itself as a trustee. See the "Participant Statement" for the period ending June 30, 1999 reflecting the balance of 491,250.00 by the surety "As Trustee For," Exhibit "QQ."

By admitting its status as a trustee, the surety acknowledges that it owes a fiduciary duty as to the owner of the Cash.  The New York Court of Appeals has held that a "trustee is under a

duty to the beneficiary to administer the trust solely in the interest of the beneficiary" Matter of Heller, 6 N.Y.3d 649, 655, 849 N.E.2d 262, 816 N.Y.S.2d 403 (2006), quoting Restatement (Second) of Trusts § 170 (1); see also, Mercury Bay Boating Club Inc. v. San Diego Yacht Club, 76 N.Y.2d 256, 270, 557 N.E.2d 87, 557 N.Y.S.2d 851 (1990) ("the trustee must administer the trust for the benefit of the beneficiaries and cannot compete with the beneficiaries for the benefits of the trust corpus").   The surety's concerted efforts to retain the Cash, and its aggressive allegations in the Complaint to that end, fly in the face of that duty.

It is well settled that "a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect." Birnbaum v. Birnbaum, 73 N.Y.2d 461, 539 N.E.2d 574, 541 N.Y.S.2d 746 (1989), rearg denied, 74 N.Y.2d 843, 545 N.E.2d 873, 546 N.Y.S.2d 559 (1989), citing, Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545 (1928).  "This is a sensitive and 'inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." Birnbaum, 73 N.Y.2d at 466.   The surety persists in being in an adversarial posture to CLAIMANTS despite the duty of undivided loyalty.

As Judge Cardozo famously stated, "[a] trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior" Meinhard, supra.

POINT III

THE SURETY FIRST EARNED MONEY MARKET INTEREST,
AND LATER, INCOME IN THE INVESTMENT PORTFOLIO

The Collateral Agreement requires the surety to disgorge the Cash "within a reasonable time" which obligation the surety has breached. Exhibit "Q." The principal was held, first, in two (2) money market accounts—Bank of New York and Highlander Capital Management, LLC.

See, Deposition of Raymond Jilek, September 28, 2010, Exhibit "K," pp. 35-39, and Exhibit "O." While in those accounts, the balance credited to BAY, as original owner, is a flat $491,250.00. Exhibit "K," p. 37. No interest is accrued to the principal balance on the statements, demonstrating that the surety was sweeping the interest. Exhibit "K," p. 37. This act violates the Collateral Agreement, which identifies collateral security as also including "...income thereon...." Exhibit "Q." Mr. Raymond Jilek, the surety's accountant responsible for financial and statutory reporting, testified at deposition that prior to 2004, the security was held in a money market interest-bearing account. Exhibit "K," pp. 5-6, 24. Mr. Jilek testified that in 2004 the treatment changed and the surety treated the security as an asset. Exhibit "K," pp. 34, 45, 51. Mr. Jilek admitted that while the surety's internal collateral report reflected a flat balance of $491,250.00, the surety was, in fact, receiving interest and investment income and does so at the present time. Exhibit "K," p. 37.

POINT IV

<u>DISGORGEMENT OF THE CASH</u>

The surety earned and retained money market interest and, later, income in its investment portfolio. Cash consists of the principal, interest and income of approximately $941,466.00 as calculated on the attached Schedule. See, Exhibit "RR." CLAIMANTS performed the calculation from information obtained in discovery, consisting of annual interest rates of return as testified to by Mr. Jilek, and investment portfolio return, as reported on the surety's Statutory Filings and Annual Statement. Exhibit "P."

CLAIMANTS assert that there is no legal theory upon which the surety may retain any portion of the Cash, and to allow same would bestow a windfall upon the surety. CLAIMANTS

are made whole by recovering the principal, together with the actually earned, compounded interest and investment return.

When calculating prejudgment interest, the central purpose is "to compensate for the delay.. in obtaining money he would have received sooner..." Paper Converting Mach. Co. v. Magna-Graphics Corp., 745 F.2d 11, 23 (Fed. Cir. 1984). Prejudgment interest on a damages award "merely serves to make the... (party) ...whole, since his damages consist not only of the value of the royalty payments but also the foregone use of the money between the time of infringement and the date of the judgment." General Motors Corp. v. Devex Corp., 461 U.S. 648, 655-56 (1983) (emphasis added).

An award of prejudgment interest is often substantial. In the seminal prejudgment interest case, General Motors Corp. v. Devex Corp, 461 U.S. at 658, the Supreme Court upheld a prejudgment interest award of $11 million that was more than 1.3 times the damages award. In Mars, Inc. v. Coin Acceptors, Inc., 513 F.Supp.2d 128, 138 (D.N.J. 2007), the District Court of New Jersey awarded more than $12.4 million in prejudgment interest in addition to an approximate $14.4 million award. In Polaroid Corp. v. Eastman Kodak Co., 16 U.S.P.Q.2d 1481 (D. Mass. 1990), amended on recons., 17 U.S.P.Q.2d 1711 (D. Mass. 1991) approximately half of the $873 million awarded in the 1991 award to Polaroid against Kodak was prejudgment interest. In Kearns v. Chrysler Corp., 32 F.3d 1541, 1552 (Fed. Cir. 1994) (the Federal Circuit affirmed a district court's award of $11.3 million in damages and $8.1 million in prejudgment interest.

"The rate of prejudgment interest and whether it should be compounded or uncompounded are matters left largely to the discretion of the district court." Bio-Rad Labs., Inc. v. Nicolet Instrument Corp., 807 F.2d 964, 969 (Fed. Cir.1986). Federal courts are generally

granted wide latitude in the award of prejudgment interest, including whether to apply simple or compound interest. See, e.g., <u>Bio-Rad Lab., Inc. v. Nicolet Instrumental Corp.</u>, 807 F.2d 964, 969 (Fed. Cir. 1986).

The Second Circuit has held in a back pay case that prejudgment compound interest should ordinarily be awarded. <u>Sands v. Runyon</u>, 28 F.3d 1323, 1328 (2d Cir. 1994).  Annual compounding is appropriate here, because the surety, as Dr. Mantell notes, has had the benefit of annual compounding for the past fourteen (14) years, and does so today.

In the case at bar, CLAIMANTS seek the disgorgement of the principal, interest and income earned and retained by the surety, which is the sum of $941,466.00 as of December 31, 2010, and $3,138.00 per month thereafter.

POINT V

THE SURETY IS NOT ENTITLED TO RECOVER<br><u>COUNSEL FEES AND EXPENSES</u>

CLAIMANTS face a belated, half-hearted claim for counsel fees by the surety.  The claim has no factual or legal basis.  The surety feigns that it is a mere stakeholder; history shows otherwise.

The surety commenced this action for a declaratory judgment, and did so, on its own behalf, aggressively asserted claims against the Cash and seeking to bar adverse claims.

The Complaint contains the following averments:

> 35. …Universal needs a declaratory judgment, <u>declaring whether the return of the Bay Property collateral is now due, or previously became due,</u> despite the lack of the contractually required paperwork, and if so, <u>whether claims to the collateral at this time are now time-barred</u>

> 36. <u>Assuming the collateral is or becomes due to be returned,</u> there are conflicting claims to the money.

- 16 -

52. By reason of the foregoing, plaintiff Universal needs a determination by this court as to who, <u>if anyone</u>, is currently entitled to the collateral, or any share thereof.

Wherefore, plaintiff, Universal, respectfully requests that this court grant all of the following relief:

\*\*\*

<u>Declaratory judgment, declaring whether or not the return of any of Bay Property's collateral is due at this time:</u>

See Complaint, Document No. 1, Exhibit "A."

The surety is not a mere passive stakeholder.  It seeks to bar claims to the Cash and asserts separate claims for bond premium, counsel fees and expenses.  The surety did not commence an interpleader action.

Significantly, the surety is not entitled to attorney's fees and expenses under the applicable provision contained in the Collateral Agreement.  That agreement provides in pertinent part,

The collateral security, together with income thereon, is pledged and deposited with surety as security:

\* \* \*

(d)  Against any liability, loss, costs, expenses and <u>attorney's fees in connection with any claim to the collateral security by persons claiming adversely to Owner.</u>

Exhibit "Q" (emphasis added).

The agreement is between the surety and BAY as "Owner." Legal fees and expenses are only recoverable by the surety if they are in connection with claims by third parties to the Cash, which claims are adverse to BAY. Exhibit "Q." CLAIMANTS are not adverse to each other.  If they were at one time before the mediation, it was not "in connection with any claim to the collateral security..." by BROOKMAR, adverse to BAY, but rather as a defendant brought to

Court by an aggressive surety.  The surety, on its own behalf, and with the intent of retaining the Cash, commenced this action. The surety cannot change the history or its motivation.

The surety did not bring an interpleader action under Fed. R. Civ. P. 22 and Title 28, USC 1335.  To do so, the surety would have had to admit that they had no claim to the Cash, and might have been required to deposit the Cash in Court.

The surety's claim for counsel fees and expenses should be dismissed, because the surety is not entitled to such a recovery under the Collateral Agreement, and because the facts and nature of the case do not support an award of "interpleader" type counsel fees.

POINT VI

THE SURETY IS NOT ENTITLED TO RECOVER
ALLEGEDLY DUE BOND PREMIUM

Historically, The surety billed Breitstone, the broker. Exhibit "SS."  It is not unusual for the broker to be the primary or sole point of contact with the surety, particularly as to a bill for bond premium.  The surety did not bill BAY.  After BAY lost the Project, the surety continued to bill only Breitstone, not CHASE or 43rd.  The surety never billed BROOKMAR.  The surety has not rendered a bill for premium in fourteen (14) years.  The City released any claim against the Sewer Bonds fourteen (14) years ago. Exhibit "L."  The surety never invaded and reduced the Cash by allegedly due bond premium. Exhibit "PP," p. 49.

To the extent that the claim goes back more than six (6) years, it is time-barred, as the six (6) year statute of limitations in New York State for breach of contract actions, is controlling. CPLR 213.

The claim for bond premium is a mere after-thought.  The surety failed to make any demand for premium, thus no premium is due. See, Boyce v. National Commercial Bank & Trust Co., 41 Misc.2d 1071, 1077, 247 N.Y.S.2d 521, 527-528 (Sup. Ct. Albany Co. 1964), aff'd 22

A.D.2d 848, 254 N.Y.S.2d 127 (3 Dep't 1964) ("If a demand was made by the plaintiffs or the fire insurance company for payment of a fire insurance premium that had become due and the bank refused or failed to make such payment, its liability for subsequent losses would then accrue. Until such demand was made for payment of the fire insurance premium and the bank refused or failed to pay no liability for any loss by reason of the failure to pay such fire insurance premium existed against the bank").

The Sewer Bonds were not at risk after the City indicated that it had no objection to their release. Exhibit "L." Thereafter, there could not have been a successful claim against the Sewer Bonds by the City. As such, there was no consideration for the charging of bond premium, which is, likely, why no bond premium was, thereafter, billed. Finally, at this late juncture, the surety should be estopped from claiming unbilled premium.

<u>CONCLUSION</u>

CLAIMANTS are entitled to $941,466.00 through December 31, 2010, and $3,138.00 per month, thereafter, from the surety, representing the principal, interest and income, actually earned on an annually compound basis, and retained by the surety for the past fourteen (14) years. This recovery should not be reduced by any claimed offsets for allegedly due counsel fees and expenses and allegedly due bond premium.

Dated: Massapequa, New York
      January 31, 2011

Jay Edmond Russ, Esq. (JR 2258)
RUSS & RUSS, PC
Attorneys for CLAIMANTS
543 Broadway
Massapequa, NY 11758
516-541-1014
jayruss@russrusspc.com

- 19 -

TO:

Vincent J. Zichello, Esq.  (VZ 3487)
ZICHELLO & MCINTYRE, LLP
Attorneys for Plaintiff,
UNIVERSAL BONDING INSURANCE COMPANY
60 East 42nd Street
New York, NY 10165
212-972-5560
zimc@msn.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNIVERSAL BONDING INSURANCE
COMPANY,

Plaintiff,

- against -

BAY PROPERTY ASSOCIATES,
JONATHAN EICHNER,
JPMORGAN CHASE BANK, N.A.,
BROOKMAR DEVELOPMENT CORP.,
ON THE BEACH ENTERTAINMENT, LLC,
WESTSHORE 480 DEVELOPMENT LLC,
and THE CITY OF NEW YORK,

Defendants.

CV-09-10030

## MEMORANDUM OF LAW

## RUSS & RUSS, P.C.

ATTORNEYS FOR DEFENDANTS
On The Beach Entertainment, LLC,
a Court-appointed receiver of
Brookmar Corp. ("Brookmar"),
and assignee of the claims of Defendants,
Bay Property Associates and Jonathan Eichner

543 Broadway
P.O. Box 149
Massapequa, New York 11758
Tel: 516-541-1014
Fax: 516-541-1077