**UNITED STATES DISTRICT COURT**　　　**ECF**
**SOUTHERN DISTRICT OF NEW YORK**

\-----------------------------------------------------------X

UNIVERSAL BONDING INSURANCE　　　　CV-09-10030 (FM)
COMPANY,

　　　　　　　　Plaintiff;

　　　　- against -

BAY PROPERTY ASSOCIATES,
JONATHAN EICHNER,
JPMORGAN CHASE BANK, N.A.,
BROOKMAR DEVELOPMENT CORP.,
ON THE BEACH ENTERTAINMENT, LLC,
WESTSHORE 480 DEVELOPMENT LLC,
and THE CITY OF NEW YORK,

　　　　　　　　Defendants.

\-----------------------------------------------------------X

**Memorandum of Law**
**on behalf of**
**Universal Bonding Insurance Company**

**Zichello & McIntyre, LLP**
Office & P.O. Address
60 East 42nd Street
New York, NY 10165
Tel. 212-972-5560
E-mail zimc@msn.com

## Contents

Authorities                                                                      i

Preliminary
Statement - -      Disputes about collateral held
                   by plaintiff Universal                                        1

Facts - -          Collateral for Surety Bonds                                   1

Point I --         The collateral is subject to deductions
                   for the annual bond premiums that were
                   never paid.                                                   11

Point II - -       Universal owes no investment earnings
                   on the collateral.  That belated claim is
                   in any event barred by limitations and
                   laches.  It should also be disallowed
                   because of the claimant's inequitable
                   and wrongful conduct.                                         20

Point III - -      Universal's attorneys' fees and expenses
                   are also properly chargeable to the collateral.              29

Conclusion - -     The Court should issue a declaratory judgment
                   disallowing the claim for investment earnings
                   and allowing charges against the collateral
                   for the unpaid bond premiums and for
                   Universal's attorneys' fees and expenses,
                   and set the matter down for an assessment to
                   determine the exact amounts.                                  34

## Authorities

Brookmar v. Tax Commission, 13 Misc 2d 722 (Sup Kings 2006) . . . . . . . . . . . . . . . . . . . 12

Columbia Nastri v. Columbia Ribbon, 367 F2d 308 (2d Cir 1966) . . . . . . . . . . . . . . . . . . 28

Genesco Entertainment v. Koch, 593 F Supp 743, 749 (SDNY 1984) . . . . . . . . . . . . . . . . 18

Gleason v. Ritchie, 267 AD 447 (4th Dept 1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Hulbert v. Clark, 128 NY 295 (1891) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

International Fidelity v. County of Rockland, 98 F Supp 2d 400, 404 (SDNY 2000) . . . . 23

Keys v. Leopold, 241 NY 189 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Klein v. Bower, 421 F2d 338 (2d Cir 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Maryland Casualty Company v. Farley, 11 AD2d 756 (lst Dept 1960) . . . . . . . . . . . . . . 29

Matarese v. Moore-McCormack Lines, 158 F2d 631, 636 (2d Cir 1946) . . . . . . . . . . . . . 28

Matter of Linker, 23 AD3d 186 (1st Dept 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Oakhill Cont'g v. City, 202 AD 530, 533 (1st Dept 1941) . . . . . . . . . . . . . . . . . . . . . . . . . 18

People v. Horowitz, 309 NY 426 (1956) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Pittston Warehouse v. Am Motorists Ins, 715 F Supp 1221 (SDNY 1989) . . . . . . . . . 24, 25

Sayers v. Rochester Tel, 7 F3d 1091, 1095 (2d Cir 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 23

Stuarco v. Salbfro Realty, 30 AD2d 80 (2d Dept 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Surrey Strathmore Corp. v. Dollar Savings Bank, 36 NY 2d 173 (1975) . . . . . . . . . . . . . 23

T.P.K. Construction Corp. v. Southern American Ins. Co., 752 F Supp 105 (SDNY 1990)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Preliminary Statement**:  **Disputes about collateral held by plaintiff Universal**

This case concerns disputes about some collateral.

The  collateral was given to the plaintiff, Universal Bonding Insurance Company, so that Universal would provide surety bonds for a company named Bay Property Associates.  Bay needed the surety bonds to give to the City of New York, in connection with a housing development Bay planned in Brooklyn.

When demands were made that the collateral be refunded--before the City had released the surety bonds--including demands from a rival claimant, other than Bay Property, Universal commenced this declaratory-judgment action.

After the action was brought, however, the City agreed that it will now release the surety bonds (docket# 39) and Bay recently reached an agreement to step aside and settle (docket# 47) for a  share any refund obtained by the rival claimant.

The rival claim came from a company named Brookmar Corp. but is being pressed here by yet another company, a company named On the Beach Entertainment, Inc. Beach was appointed to act as receiver for Brookmar, by agreement with Brookmar's owner, Brad Zackson, against whom Beach had obtained, by confession of judgment, a personal judgment (though no judgment against the Brookmar corporation).

Despite the recent post-litem resolution of some of the issues, other disputes remain.  The governing written agreements allow Universal to deduct from the collateral for annual bond premiums that were never paid. Beach objects. The

1

agreements state that the surety will pay no interest on the collateral deposit and not be responsible for any income. Beach demands interest or investment income. The agreements allow Universal to charge its litigation expenses against the collateral. Beach protests.

The resolution of these remaining disputes is of course controlled by the applicable written agreements themselves; the answers are to be found right in the text of those agreements. But the written agreements are perhaps more easily understood, and their intent better appreciated, in the context of a fuller history of this entire matter, to which we next turn.

### Facts: Collateral for Surety Bonds

The history of this matter begins when a man named Jonathan Eichner planned a housing development in Brooklyn. Situated near Gravesend Bay, it was to be called Rose Cove Marina and was to be developed by a company Eichner formed for the purpose, Bay Property Associates. (Exhibit 1: Prospectus Cover, area map, plot plan)

Though a private development, Bay was required to have certain ancillary work done for the City of New York--sewer work, paving work, fire hydrants and fire- alarm call boxes.

And the City insisted that Bay's commitments for that ancillary work be backed up by a surety company acceptable to the City. (Exhibit 2: Letters from City departments)

2

### The Three Surety Bonds

More particularly, the City required three separate surety bonds,  one for each separate type of work, in dollar amounts specified by the City, as follows:

- Sewers, etc.            $1,000,000 (Exhibit 3)

- Paving, etc.            $  300,000 (Exhibit 4)

- Fire alarms, etc.       $    50,000 (Exhibit 5)

The City itself also dictated the terms of the three surety bonds.  Among other things, the text of the bonds contemplated a 10-year-long project followed a 2-year guarantee period. The project's time clock could not start until a go-ahead from the City's Board of Estimate, and the time frame could be extended by the City ---without notice to the surety. (Exhibits 3, 4 and 5)

The surety bonds contained no fixed time limits.  By their terms, the three surety bonds were to remain in force until the surety was formally "released" from its obligations, by a "written statement", signed by certain specified City officials, and containing certain required certifications. The pertinent  contractual condition of the DEP bond (Exhibit 3) reads as follows:

> The Surety shall be released from the obligations of this bond upon   receipt by the Surety of a written statement executed by said Commissioner, Assistant Commissioner, or Deputy Commissioner or the by the City's Corporation Counsel or an Acting Corporation Counsel certifying that the aforesaid work has been completed and accepted, that the two (2) year maintenance period has expired, and that the  work did not require repairs during said period, or that any such  repairs have been completed, and consenting to the release of the bond.

3

*          *          *

> This bond may also be released, or the face amount of this
> bond may be reduced by resolution of the City's Board of
> Estimate.

Equivalent provisions are found in the two other bonds, referring  respectively to

the DOT Commissioner (<u>Exhibit</u> 4) and the Fire Commissioner. (<u>Exhibit</u> 5)

None of the  specified releases, or written certificates, has ever been received.

However, after this declaratory-judgment action was brought, the City

stipulated that it will now release the three surety bonds--with the proviso that new,

replacement bonds will have to be given before the City will permit anyone to resume

work on the project.   (Docket# 39)

### The General Indemnity Agreement

The three surety bonds Bay gave to the City were obtained from the Universal

Bonding Insurance Company.

The arrangements for the bonds were made between Bay's insurance broker,

Breitstone & Co., and Universal's in-house underwriters.  The bonds were actually

issued in the name of other sureties, like North River, Universal's underwriters signing

by powers of attorney, as they were authorized to do.

Before signing the bonds, Universal's underwriters examined the usual financial

and other information, and obtained Universal's standard "General Indemnity

Agreement", not only from Bay Property Associates but also from Jonathan Eichner,

personally. (<u>Exhibit</u> 6:  General Indemnity Agreement)

4

## Bond Premiums

In addition to indemnity against bond claims by the City, the General Indemnity Agreement guaranteed payment of annual bond premiums until the formal bond-releases were obtained from the City and delivered to Universal, the pertinent provisions reading as follows:

> **1. PREMIUM.**  That the Indemnitor will pay . . . to the Company the annual premium therefore  . . . until the legal evidence satisfactory to the Company of its final discharge from such suretyship and any and all renewals and extensions thereof.

*          *          *

> **2. INDEMNITY**.  The indemnitor and his successors agree to indemnify . . . premiums on the Bonds issued by the Surety on behalf of the Principal.

As already mentioned, no written evidence of the surety's final discharge was ever presented to Universal, or even obtained, and it was only after this action was brought that the City agreed it would now release the bonds.

## Litigation Expenses

The General Indemnity Agreement also provides for indemnification of Universal's expenses and attorney's fees.  This is not limited to fees and expenses incurred in dealing with bond claims; it explicitly includes expenses and attorney's fees for all of the following:

- To procure the discharge of such bonds (<u>Exhibit</u> 6: article 3 "Indemnity") (As this suit accomplished.)

5

- To recover losses or expenses from the Indemnitors or third parties (Ibid) (As this suit seeks.)

- To recover . . . premiums on Bonds (Ibid)  (Also sought here, because resisted by Beach.)

- In any suit on this [i.e., General Indemnity] Agreement (Id, subpara "E") (Which this suit is.)

The General Indemnity Agreement goes on to provide that

> [C]ollateral may be held by the Surety until it has received evidence of its complete discharge from such claim or potential claims, and until it has been fully reimbursed for all loss, expense and attorney's fees. (Exhibit 6:  Gen Ind Agmt, art 6, "Collateral Security")

### The Collateral Security Receipt and Agreement

The foregoing provisions of the General Indemnity Agreement are reinforced by a "Collateral Security Receipt and Agreement" (Exhibit 7) which among other things provides that the collateral is given as security for *all* of the following:

- For the payment of all premiums on such bonds [subpara (b)];

- For attorney's fees arising or incurred in connection with the above captioned bond or any other bond [subpara (a)]

- For expenses and attorney's fees in connection with any claim to the collateral security by persons claiming adversely to [Bay Property] [subpara (d)]

- For expenses or attorney's fees arising from claims to any part [of the collateral] by any person claiming adversely to the Owner [i.e., Bay Property] [Id, unnumbered subpar after subpar (d)]

6

Universal incurred expenses and attorney's fees in this case by reason of adverse claims to the collateral until the recent sharing agreement between Bay and Beach. Universal continues to incur attorney's fees and expenses because of Beach's opposition to Universal's deducting for unpaid premiums and for expenses from the collateral.

### The Letter of Credit

The collateral security given by Bay to Universal for the $1.35 million in surety bonds originally took the form of a $500,000 letter of credit from Chase Bank. (Exhibit 8: Letter of Credit)  To obtain the LOC, Bay's Jonathan Eichner had to deposit $650,000 worth of personally owned assets or funds with Chase. (Eichner 22:11 to 25:22, 33:11 to 34:6, 57:5 to 58:25, 79:11-20)[1]

### Project Gets Started

With the three City agencies holding the three surety bonds, Bay proceeded with its project. After erecting some structures and partly completing a number of housing units, however, Bay faltered financially, and Chase then foreclosed on various mortgages Chase held on the real estate. (Eichner 9:18 to 10:18)

### Foreclosure and Sale

By the time Chase foreclosed, not only had some of the buildings been erected by Bay but some of the sewer work had been installed. The sewer line, however, was no good.  Infiltration was occurring, and the City wanted the entire sewer line removed

---

[1]References are to deposition testimony.

7

and re-built.  Chase estimated it would cost $1.25 million to re-do the sewer work
(<u>Exhibit</u> 9:  Chase internal memo "Recommendation to Sell")

### Chase Sells Real Estate to Brookmar

Obviously concerned that the City might invoke the sewer bond, and thereby
trigger a draw-down of the LOC, Chase implored the City "please do not call the
bonds", to allow time for Chase to sell the property and bring in a new developer.
(<u>Exhibit</u> 10 :  Chase 10/28/91 letter to DEP)

Evidently the City was willing to wait.  (It was after all a 10-year-plus project.)  In
the meantime, Universal's status inquiries to the City went unanswered.  (<u>Exhibit</u> 11 :
Universal status inquiry letters to City Depts)

Eventually, Chase found a new developer:  Brookmar.  Brookmar agreed to buy
the real estate from Chase.  (<u>Exhibit</u> 12 :  Agreement to Sell Real Estate, 12/6/93.)

It was of course purely a real-estate deal, to sell Brookmar the real estate, title to
which was then held by a Chase special-purpose entity (Bay 43d Corp.).  Accordingly,
the Agreement to Sell said nothing at all about the LOC or about the surety bonds that
Universal had issued for the Bay Property Associates company.

The real estate sale was strictly between Chase and Brookmar; neither Bay nor
Universal was involved.

After the sale agreement was made, Chase indicated it expected Brookmar, as the
new developer, to replace the LOC Chase had issued to Universal for Bay.  But
Brookmar balked. (<u>Exhibit</u> 13 :  3/19/94 letter to Chase attorneys.)

Instead, it transpired that Brookmar wanted to appropriate for itself the use of the three surety bonds that had been issued for the Bay Property Associates company, and the City permits, and variance, that had been granted to Bay after Bay posted those three surety bonds.

With Brookmar thus stymying Chase's plans to remove it LOC, this led to a further agreement between Chase and Brookmar, whereby Chase settled for a $950,000 escrow deposit from Brookmar. (Exhibit 14 :  Agreement of May 17, 1994).

The escrow agreement was purely between Chase and Brookmar; Bay was not a party, nor was Universal, and there is no evidence it was even disclosed to Universal at that time.

### Brookmar hijacks Bay surety bonds

Brookmar did contact Universal, to inquire about past-due premiums (Exhibit 15: 6/8/94 fax) and then even tendered a check (Exhibit  16 : 6/24/94) which however Universal declined when Brookmar's cover letter indicated that Brookmar wanted to simply take over the surety bonds that had been issued for the Bay Associates company. (Exhibit 17:  )

Brookmar nevertheless refused to obtain its own surety bonds, whether from Universal or from any other surety company. (Exhibit 18 )  Instead, Brookmar defied Universal.  Reminding Universal that the Bay Property bonds were "irrevocable" - - so Universal was powerless to cancel them - - Brookmar simply went ahead with the housing development.  Using the bonds, and the creditworthiness of the sureties which

9

those bonds stood for, Brookmar was allowed to proceed by the three City departments. In addition, Brookmar thereby latched on to a variance the City had granted to Bay. (Zackson 35: 19-25, 55:15-20, 59:12-13)

Brookmar thus hijacked the Bay Property surety bonds, or, in legal parlance, Brookmar wrongfully converted the Bay Property surety bonds to Brookmar's own use and benefit.

That left Universal on the hook to the City, along with the presumably insolvent Bay Property company, which remained as principal obligor on the surety bonds. It also left the hapless Jonathan Eichner on the hook to Universal, for, in addition to depositing $650k worth of his own, personal assets for the Chase LOC, Eichner had signed the General Indemnity Agreement, personally agreeing to indemnify Universal for all loss it might incur under the $1.35-million in bonds, and for all expenses.

Thus Brookmar took for itself all the benefits of using the Bay Property surety bonds but left all the risks with Universal and Mr. Eichner, if something went wrong, if the bonded work was not completed to the City's satisfaction. Which in fact Brookmar already knew was the case with the sewer.

### The Sewer

Brookmar knew about the sewer when it bought the property - - knew it was no good, knew the City wanted the sewer completely removed and replaced, knew of Chase' $1.25-million cost estimate to re-do the sewer. (Zackson 91:11 to 92:9, 99:1-13 to 100:25) Indeed, Chase cited the defective sewer as justification for selling the property

10

to Brookmar at a bargain price. (Exhibit 9)

Instead of doing what the City wanted however, Brookmar was going to try to get by with a 200k to 300k repair job. (Zackson 75:10-20)

When that cheap fix did not work, however, Brookmar simply sealed off sewer openings and then told the DEP that Brookmar had decided to completely cancel the planned housing development (Exhibit 19). On the strength of those assurances, Brookmar was apparently able to obtain a letter from a DEP engineer stating he had "no objection" to the release of the DEP sewer bond. (Exhibit 21 : 10/9/96 letter from M. Farag to Brad Zackson). Brookmar's Mr. Zackson characterized this as an "unofficial deal." (Zackson 144:5)

Contrary to movant's assertions, there is no evidence that any copy of the 1996 "no objection" letter from the DEP engineer to Zackson made it to Universal at the time. It was, however, shown to Universal's current employees (by me) after proffered by Beach's counsel, many years later, in 2009, when Beach was trying to get the collateral refund. In any event, the letter plainly fails to satisfy the bond requirements. (Exhibits 3, 4 and 5) (See also Squatrito 42:11 to 45:7). Nor of course does the DEP engineer's letter apply at all to the DOT or FDNY bonds.

Furthermore, despite what Brookmar was telling the DEP, it seems that Brookmar never did completely end its plans for the housing development. Through an affiliated entity, Marina Development Associates, Brookmar's Zackson sought to attract new investors. (Zackson 55:25 to 56:14) Ultimately, Brookmar/Marina sold the

11

whole project to a new developer, Westshore Development, extracting an agreement that Westshore would complete the sewer work to the DEP's satisfaction, and would obtain from the three City departments the three formal releases required to discharge all three surety bonds - - the same three surety bonds Universal had provided years earlier for the Bay Property company (Exhibit 22 : Brookmar-Westshore Agreement, 12/24/07).

### Brookmar's Benefits

All told, Brookmar benefitted greatly by its activities, including by Brookmar's wrongful conversion of the Bay Property surety bonds.

Chase had advanced some $18,633,164 to Bay Property for the development, including under a series of building loans, for construction work done during Bay's tenure. (Exhibit 24 : Maher affidavit p. 4  para. 5)  Despite all that money that went into the development, Brookmar was able to buy the property from Chase - - land *plus* improvements - - for a mere $1,650,000.  (Exhibit 12 : Agreement to Sell; Zackson 97:6)

Brookmar and its related entity, Marina Development (to whose name Brookmar had transferred title) then petitioned for a real-estate tax reduction.  Zackson contended the fair market value for the $18-million development was no more than the $1.65 million he had paid Chase. (Zackson 97:6)  The tax case was unsuccessful.  See Brookmar v. Tax Commission, 13 Misc 2d 722 (Sup Kings 2006) (copy in our Exhibit 25.)

And when the City sold a portion of the property, to cover real-estate taxes

12

Brookmar had never paid, the purchaser paid $10,650,000 - - for only *part* of the original property.  (Ibid)  (Exhibit 26)

The purchaser was Westshore Development, LLC.  (Ibid)  Brookmar thereafter sold Westshore the remaining piece of the property - - for an *additional* $6,000,000. (Zackson 54:23 to 55:14)

The 16-million-plus Westshore paid is obviously consistent with the 18-million-plus Chase said went into the development, though ten times Brookmar's own initial $1,650,000 investment.

### Brookmar sues Westshore

Not content with its handsome gains on the real estate, Brookmar wanted Westshore to do the still required sewer work and thereby obtain the requisite bond releases from the three City departments, which Brookmar obviously knew were necessary, so Brookmar itself could lay claim to a refund of the Bay Property collateral, which had been transformed into cash collateral when Chase declined to renew the LOC and Universal drew against it.  And when Westshore failed to do so, Brookmar sued Westshore.  (Exhibit 23:  Brookmar v. Westshore complaint, 5/6/09.)

Brookmar's lawsuit against Westshore seems to have been abandoned, however, when Brookmar's Brad Zackson agreed to turn over "Brookmar's" claims to his judgment creditor Beach. (Zackson 90:14-22)

13

### Brookmar assigns to Beach

On the Beach Entertainment is owned by Cathy Wallach, a sometime business associate of Brookmar's Brad Zackson. (Zackson 5:21 to 8:25). Beach had obtained a judgment against Zackson, personally. Actually, Zackson had given confessions of judgment. (Zackson 13:14 to 14:25) Though a personal judgment, it related to various Zackson business entities, but notably not Brookmar. Nevertheless, Zackson consented to have Beach appointed as a receiver for the Brookmar corporate entity's receivables, and, although the appointing order does not actually specify (cf. CPLR 5228) Zackson seems to have offered up Brookmar's claim to the Bay Property collateral, as a way of satisfying the personal judgment against him. (Exhibit 34 )

Beach's judgment against Mr. Zackson is for $470,000. However, Beach's claim here, against Universal, is for $1.4 million (docket #33 :Amended Answer and Counterclaim) which counts the full amount of the 1996 draw against the LOC ($491,250) with no deductions for the unpaid annual bond premiums since then, plus Beach's claim for "investment earnings" from 1996, and no recognition of Universal's right to deduct expenses and attorney's fees. (The $491,250 figure results from an earlier, partial draw against the $500k LOC, for some unpaid premiums.)

### The "Earnings" Dispute

The Collateral Security Receipt and Agreement (Exhibit 7) states plainly that the surety shall "pay no interest on the collateral security".

It also states plainly that the surety shall "assume no responsibility for the

14

earning of any income thereon".

The pre-printed Collateral Receipt form contains other provisions - - not applicable here - - which pertain to situations where what is originally "pledged and deposited as collateral" is income-producing, in which case the "income thereon, is pledged and deposited with the Surety as security" along with the value at the time of the initial pledge and deposit. However, when the collateral is a "certificate of deposit" or "other instrument" and is kept on deposit with some third party, it is the depositor who assumes all responsibility for the deposited funds.

Universal's collateral-account records do indicate that Universal did pay interest in modest amounts (1/2% to 2%) on some accounts, but not others, and not on Bay Property's account. (Exhibit 28  and Exhibit 30)

The talisman evidencing that there was an agreement to pay interest is a tax "I.D." number. Where no tax number appears in Universal's records, Universal did not pay interest on the collateral deposit. There is no tax number for Bay Property's account. Consequently, no income was ever reported as taxable to Bay Property. Any tax consequences were borne by Universal itself and by Universal's successor companies.

And this course of conduct continued, for all the years the collateral has been held, without a complaint or question, and without any demand for interest or income, whether from Bay or Brookmar or anyone else, until the very recent demands made for the first time here by Beach.

## Beach's Demands

In the meantime, Universal had been acquired by the Kemper Group of insurance companies and merged into Kemper Casualty Insurance Company, a subsidiary of the Lumbermens Mutual Insurance Company. The Kemper name was recently sold, and the insurance company group is now called the Lumbermens Mutual Group. (Jilek 4 to 8, 57:16-23 to 58:20)

After reaching agreement with Mr. Zackson, Beach contacted Kemper and demanded the Bay Property collateral. When Beach pressed its demands - - but could not produce the requisite bond releases and could not produce documentation to prove entitlement to the Bay Property collateral - - Universal commenced this declaratory-judgment action. [Docket # 1]

The post- litem agreements, first by the City and then between Bay and Beach, have mooted the bond-release issue and the ownership issue. What remains are Beach's opposition to Universal's deducting unpaid premiums from the collateral, Beach's claim for adding investment earnings, and Beach's objections to Universal's deducting attorney's fees and expenses.

## Point I

### The collateral is subject to deductions for the annual bond premiums that were never paid.

Universal's right to deduct the unpaid bond premiums from the collateral cannot seriously be questioned. Such deductions are plainly authorized by the governing

16

agreements.  And the operative facts are beyond dispute.

The governing agreements provide among other things that the collateral is held as security for the "payment of all premiums" for the surety bonds (Exhibit 7: Collateral Security Agreement, subpar. "b") and that annual premiums are due and continue to become due until the surety receives "competent, written, legal evidence satisfactory to the Company [i.e., Universal] of its final discharge from such suretyship" (Exhibit 6:  General Indemnity Agreement, art 1).

As to what constitutes such "satisfactory evidence", the bonds themselves are very specific:  either a written statement executed by the Commissioner (or other high-level City officials designated in the bond) or a resolution of the City's Board of Estimate.  (Exhibits 3, 4, and 5, para. no. 3).  Nothing less suffices.

No such release documents were ever presented to Universal, not for any of the bonds.  No one says otherwise, or could truthfully say otherwise.  And since the stated bond conditions for release of the surety were never complied with, it follows that the annual bond premiums continued to accrue.

At this point, we could end our discussion.  Indeed, further discussion ought to be precluded.  The very specificity of those explicit bond conditions operates to rule out further discussion, as a matter of law.  They ought also to make further discussion unnecessary.  The requirement for the "written statements" certifying satisfaction with the bonded work spares us the trouble of further inquiry, and, better still, prevents any possible disputes, about the actual state of the work out at the housing site.  The

17

formalities remove any worry about the City's intentions for things like that defective sewer. We don't have to rely on opposing counsel's personal opinion that there was no risk the City would ever make a fuss about the defective sewer "abandoned" by his client. And the bonds' designating specified City officials avoids uncertainty about the legal authority of municipal employees - - always a perilous subject.

One dealing with an agent of a municipal corporation must, at his peril, ascertain the agent's authority. Oakhill Cont'g v. City, 202 AD 530, 533 (1st Dept 1941). The doctrine of apparent authority does not apply to city officers or employees. Genesco Entertainment v. Koch, 593 F Supp 743, 749 (SDNY 1984).

But a contractual condition precedent for a release from a specified official also means that nothing else counts, whether signed by a rank-and-file sanitation worker or by the mayor himself.

Which is why it is immaterial whether or not Universal ever received any copy of the 1996 letter of the DEP engineer addressed to Brookmar (Exhibit 21 ) that counsel for Beach now proffers, but which seems never made it to Universal's file before. At most, the "no objection" letter is the first step in a bureaucratic process whereby, ultimately, maybe, the Commissioner would sign a bond-release. But for whatever reason (to keep its options open?) Brookmar never followed through, never got the actual release, from the Commissioner. The engineer is not "the Commissioner". On its face therefore the engineer's letter is not sufficient, not even as to the DEP bond, let alone as to two other bonds, the bonds for DOT and FDNY, respectively. Indeed, Mr. Zackson himself

18

characterized the letter in question as nothing more than an "unofficial" deal. (Zackson 144:5)

It is also immaterial what Brookmar's subjective intentions may have been at various times during Brookmar's tenure as developer - - first trying to get by on the cheap by patching over the defective sewer work, then by telling the DEP engineer that Brookmar was had "no intention" of moving forward with the project, then by trying to recruit investors for the project, and ultimately by selling the whole project to Westshore. While Brookmar kept its options open (and made unauthorized use of the Bay Property surety bonds and the permits and the variance linked to them) Brookmar never complied with the bonds' protocols for releasing the surety.

Brookmar clearly recognized as much when, in 2009, it sued Westshore for not obtaining the formal bond releases Brookmar itself had admittedly never obtained. So it ill behooves Brookmar (or Beach) to now try to get out of paying the bond premiums.

But they try anyway, now by invoking the statute of limitations.

The "limitations" argument is legally frivolous. For it is "black letter law" that the running of the statute of limitations does not impair the right to use collateral to pay the collateralized debt. See 75 NY Jur 2d "Limitations and Laches" §20; 54 CJS "Limitations of Actions" §11; Restatement of Security §47.

The usual verbal formulation of the rule is that the statute of limitations merely bars a remedy but does not destroy or discharge the underlying debt. See, e.g., Hulbert v. Clark, 128 NY 295 (1891).

19

The same result can be reached by force of <u>NY CPLR</u> 203(d), which provides that a defense or counterclaim is not barred to the extent of a claim asserted which arises from the same transactions or occurrences. In the case at bar, Universal's answer to Beach's counterclaims [docket # 40] pleaded a set-off for the bond premiums that were never paid.

Clearly, then, the unpaid bond premiums get deducted from the collateral before any refund.

### Point II

**Universal owes no investment earnings on the collateral. That belated claim is in any event barred by limitations and laches. It should also be disallowed because of the claimants' inequitable and wrongful conduct.**

**Laches bars the claim for interest or investment income**

Beach covets the income Universal earned on the collateral, from pooling it with other deposits, but Beach's assignor Brookmar never made any claim to those earnings, while on its part Universal reported the earnings to tax authorities every year and gave full and complete accountings to insurance regulators (who, by the way, approved Universal's collateral-handling practices). Beach's claim therefore comes too late. It is barred by the doctrine of laches.

Brookmar elbowed its way in as long ago as 1994, when Brookmar wrongfully usurped the use of Bay Property's surety bonds. (<u>Exhibit</u> 18) And by 1996, Brookmar

20

was writing Universal about the collateral (Exhibit 20). But not a word about interest or earnings. No demands. No inquiries. And, significantly, Brookmar never offered any tax "I.D." number.

Consequently, all tax consequences were borne by Universal. And Universal used the annual earnings, as permitted by insurance regulators, to whom Universal gave annual accountings. (Jilek 6)

To complicate matters further, not all collateral accounts were treated the same way by Universal. In some cases Universal evidently did pay or at least accrue interest, though in small amounts, ranging from ½% to a high of 2%. Presumably this resulted from special agreements with favored customers. The trouble is, there is no one around to ask. The employees from the days when Universal was an independent company are long gone. Some left on bad terms, after Universal's book of business was moved to Kemper's home office, in Illinois. So all we have to go on now are the account records themselves. Those records show that only some of these collateral accounts accrued interest for the depositor, in which case the account reflected the customer's tax "I.D." number. So Kemper (now Lumbermens) simply went by those account records. (Jilek 26:7 to 28:18, 31:6-9, 34:14-16, 54:4-25, 59:18-25, 81:25 to 82:8) (Squatrito 7:21 to 8:17, 64:17-25, 65:19-25)

Bay Property, however, was always carried on the books among those accounts that were *not* accruing interest. And, in all these years, no one ever voiced any objection or sought any change. (See Eichner 46:8-13) To go back now, and revise those

21

arrangements, is obviously prejudicial to Universal's successor company.

Because of the resulting prejudice to Universal's successor, the belated claim to the earnings is ruled out by the doctrine of laches. See, e.g., <u>Matter of Linker</u>, 23 AD3d 186 (1ˢᵗ Dept 2005) reversing an award and dismissing a petition for a trust accounting where petitioner waited for years, the appellate court holding that laches barred the claim because the delay resulted in prejudice from "change of position, loss of evidence, or some other disadvantage." (<u>Id</u> at 189)

**Limitations bars Beach's claims**

Furthermore, even if there had been no prejudice to Universal, Brookmar's delay, alone, would mean that the statute of limitations (<u>CPLR</u> 213) would rule out all but the earnings for the six years immediately preceding Beach's recently created claim for interest or income. See, e.g., <u>Gleason v. Ritchie</u>, 267 AD 447 (4ᵗʰ Dept 1944) denying an accounting for all but the six years next preceding the commencement of the lawsuit. But even that window is not available here where, as early as 1996, this claimant was writing Universal about releasing the collateral and not getting a satisfactory (to claimant) response. And its current motion seeks interest for money allegedly "wrongfully denied" from December 1996.

In such a case, the statute of limitations for the claims claimant now asserts expired six years after 1996, in 2002, well before claimant for the first time sued on its claims for an accounting of investment earnings. Such claim is therefore completely barred at this time. See <u>Klein v. Bower</u>, 421 F2d 338 (2d Cir 1970); <u>Keys v. Leopold</u>, 241

NY 189 (1925). Indeed, under claimant's theory even its claim for the principal amount is time-barred.

Surely, therefore, both limitations and laches bar Beach's claims for an accounting of income earnings , even assuming such claims otherwise could have any valid basis. Which they do not.

### No basis for claim to interest or investment earnings

The agreement (<u>Exhibit</u> 7) pursuant to which Universal holds the collateral is plain enough. Universal "shall pay no interest on the collateral." Furthermore, Universal assumes "no responsibility for the earning of any income on the collateral." "No responsibility."

Where money is deposited with third parties, and evidenced by a "certificate of deposit" or "other instrument", all responsibility is the depositor's.

Where the collateral has a "market value" (e.g., equity stocks), Universal is not liable for any "loss or depreciation"; in such event, Universal may even demand "additional collateral."

Where the collateral "pledged and deposited" is itself income-producing collateral (like the certificate of deposit or equity stocks) the "income thereon" does not get distributed to the depositor, but in such a situation does get added to the collateral security.

The written agreement governing the collateral could not be clearer; all the more so when the key provisions are read in context with other provisions. Which is a well-

23

recognized canon of interpretation. See Sayers v. Rochester Tel, 7 F3d 1091, 1095 (2d Cir

1993); International Fidelity v. County of Rockland, 98 F Supp 2d 400, 404 (SDNY 2000).

The old Law Latin is "ut magis valeat quam pereat", in other words, so that all

provisions are given effect, no provision superseded or nullified.

An even broader context further highlights this reading. These written

agreements are like adjustments to the "default setting" of what the law would

otherwise provide, in their absence. Contrasting the contractual "adjustments" with the

"default" rules enhances clarity.

When money is deposited as security, and there is no explicit agreement at all,

one way or the other, concerning interest or concerning earnings on the security

deposit, the law infers that no such payment was intended. Surrey Strathmore Corp. v.

Dollar Savings Bank, 36 NY 2d 173 (1975).

That is the law in New York, where the transaction which gives rise to this case

originated; it is also the law in Illinois, where the company that holds the collateral is

currently headquartered and incorporated. See Strathmore, 36 NY 2d at 178, n. 1.

The Strathmore case dealt with money deposited with a mortgage bank, for real

estate taxes. But the same analysis has been applied to collateral deposited with a

surety company. See, e.g., Pittston Warehouse v. Am Motorists Ins, 715 F Supp 1221

(SDNY 1989) where Judge Sweet rejected a claim for interest on collateral held by a

surety when there was no written agreement to pay interest. (A later time period was

covered by such a written agreement). Pittston at 1227.

To reverse the normal inference against interest or earnings an explicit agreement is needed. An example is found in Brookmar's escrow agreement with Chase (Exhibit 14: Agreement, p. 3; para. "c"), inserted at the insistence of Brookmar's lawyer. (Zackson 120:33 to 121:7). Another example can be found in the specimen of a different form of collateral receipt, used by a different surety, in an unrelated matter which - - in contrast to the one controlling here - - does provide that no interest shall be paid "except such interest as may be paid by the bank of deposit" in which event the collateral plus such interest is paid at the end, when the surety is released from all bond liability. (Exhibit 35 : Specimen Collateral Receipt, art. 6)

The normal "default setting" rule against paying interest or accounting for earnings is also the very reason why special statutes have been enacted for certain situations, such as real estate leases. See People v. Horowitz, 309 NY 426 (1956). The New York real estate lease statute was the basis for the case relied on by claimant here, Stuarco v. Salbfro Realty, 30 AD2d 80 (2d Dept 1968).

We are not aware of any statute mandating payment of interest or accounting for earnings on collateral in a situation such as ours. Nor has the claimant here pointed to such a statute. Nor was any such statute referred to in the Pittston case, cited earlier, where a claim for interest on collateral given to a surety was rejected by Judge Sweet. (715 F Supp at 1227).

In our case, moreover, we don't have to rely on the "default setting" rule; our agreement here is *not* silent. It provides that the surety shall "pay no interest on the

25

collateral". It also provides that the surety has "no responsibility for the earning of any income thereon". "No responsibility".

In the face of such specific provisions, it avails the claimant nothing to engage in what New York's highest court deprecated as abstract discussions or "categorical concepts suggested by such labels as 'trust'". <u>Strathmore</u>, 36 NY2d 173 at 176. Claimant's reliance on cases dealing with actual trusts is therefore completely wide of the mark here.

Claimant is also mistaken in saying that Lumbermens' Mr. Squatrito refused to pay interest here "solely" because there was no W-9 form on file. Mr. Squatrito actually said just the opposite. He quite properly pointed to the written agreement governing the collateral. (Squatrito 14:22 to 15:3, 18:20-24, 19:10-16) Obviously, when there *is* a W-9 on file it is a talisman of a special agreement to accrue some interest for those particular accounts, presumably an agreement made by underwriters "back when it was still in Universal Bonding's - - before it was Lumbermens". (Jilek 25:12 to 27:22) (See also <u>Exhibit</u> 30).

Finally, as additional evidence that no interest or earnings were due, we may look to the conduct of the parties. The claimant now covets the earnings that the collateral in the pooled account yielded for so many years. During all that time, however, Brookmar never once said anything about claiming interest, and never offered its tax I.D. number.

**Brookmar's inequitable conduct should bar further profit**

26

The inequitable conduct of Mr. Zackson and his Brookmar company is set forth in detail above (pp 9 to 13) They wrongfully converted to their own use the three surety bonds intended for use by Bay Property, leaving Universal at risk to the City, and leaving Eichner to indemnify Universal for any bond claims and expenses. Buying the real-estate at a distressed price, Brookmar and Zackson ultimately gained ten times what they paid. They never fixed the defective sewer for the City, but foisted the project off onto Westshore, on top of which they wanted Westshore to get those three surety-bond releases, so Brookmar could grab for itself the collateral put up by Bay Property. Then they assign their claim to Zackson's judgment-creditor, to satisfy a personal consent judgment against Zackson. Grasping for still more, Mr. Zackson hopes for a bonanza to the extent his judgment creditor's claim for "investment [*sic*] income" on an investment Zackson never made goes beyond what is needed to satisfy the judgment against him. (Zackson dep 14:25 to 15:14)

All things considered, it is Zackson and Brookmar who should be made to account, for the unjust enrichment they gained at the expense and risk of others - - not the other way around.

Such an accounting begins by charging for the bond premiums for the three surety bonds Zackson and Brookmar converted to their own use. The law imposes such charges even if there were no contractual provisions such as discussed under our Point I above. See Restatement (First) Restitution §157(1)(b); 22A NY Jur 2d, Contracts § 589.

But that is just the beginning. Where the unjust enrichment begins with wrongful

27

conduct, like Brookmar's wrongful conversion of the Bay Property surety bonds here,

the wrongdoer is not entitled to keep *any* of the profits gained by such wrongful use.

Restatement (First) Restitution §151, comment "f".

In such cases, the wrongdoer must give to the victim the amount by which the

wrongdoer has been enriched.  Restatment (First) Restitution §1, "Unjust Enrichment",

comment "e", puts it this way:

> Thus where a person with knowledge of the facts
> wrongfully disposes of the property of another and makes a
> profit thereby, he is accountable for the profit and not
> merely for the value of the property of the other with which
> he wrongfully dealt.

So, for example, one who wrongfully uses another's trademark must account for

the all profits thereby gained.  See Columbia Nastri v. Columbia Ribbon, 367 F2d 308

(2d Cir 1966).  So held the Second Circuit. The cited case involved a trademark.  A

surety bond is more, not just a mark of approval but a guarantee, a financial

commitment to the "buyer" of what the bond's principal obligor is "selling".

Calculating the "profit" in such cases is not always easy.  But the burden is on

the wrongdoer to come forward with proof of costs contributed with its own money.

See Matarese v. Moore-McCormack Lines, 158 F2d 631, 636 (2d Cir 1946).  A burden

recognized by the Second Circuit.

Here, we know that Brookmar purchased the property for about $1.6 million and

pocketed $6 million from Westshore, after Westshore paid more than $10 million for

back taxes owed by Brookmar.

28

Brookmar has a lot to account for before getting close to a "bottom line" in favor of the claimant here.

### Point III

### Universal's attorneys' fees and expenses are
### properly chargeable to the collateral.

Universal's entitlement to charge its expenses and attorneys' fees to the collateral is also beyond question. Such entitlement is not limited to amounts incurred in lawsuits brought against Universal by bond-claimants. Such entitlement applies as well to a case such as this, where a surety company like Universal brings a declaratory-judgment action concerning collateral. The governing agreements are clear, as are the controlling legal precedents.

A case in point is <u>Maryland Casualty Company v. Farley</u>, 11 AD2d 756 (lst Dept 1960). (The Farley by the way was Jim Farley, the famous political leader.) In the Farley case, when demands were made for the return of some collateral, the surety brought a declaratory-judgment action. The court held that the surety was not obliged to act at its peril but could choose to resolve the controversy by means of a declaratory-judgment action. (11 AD2d at 758)   The Farley-case court went on to hold that in such a case the surety was entitled to counsel fees, because the governing indemnity agreements provided for reimbursement of fees incurred "in enforcing the obligations arising under the agreements". (<u>Farley</u>, 11 AD2d at 758).

Another case illustrating that such provisions are *not* restricted to fees incurred

29

in defending against bond claims, by third parties, is <u>T.P.K. Construction Corp. v.</u>
<u>Southern American Ins. Co.</u>, 752 F Supp 105 (SDNY 1990).  There T.P.K. sued its own
surety.  The surety counterclaimed for fees and expenses incurred in that very action.
Judge Patterson rejected T.P.K.'s contention that its agreement to indemnify the surety's
counsel fees did not apply to the litigation between T.P.K. and its own surety but only
to claims by third parties.  (752 F Supp at 111).

In the case at bar, Universal was being pressed with demands that it return the
collateral.  The specified bond-releases had never been obtained.  Brookmar had even
filed suit blaming Westshore for not obtaining those releases.  But Mr. Zackson then
passed the baton on to Brookmar's receiver, Beach, whose lawyer contended (and still
contends) that the specified releases were not really needed at all.  To resolve the
controversy, Universal brought this declaratory-judgment action.

It was only after this action was brought, that the City stipulated [docket # 39]
that the City would now release the three bonds in question (though the City insisted
on new bonds when work resumes).  The fees and expenses Universal incurred in the
process are certainly reimbursable, as incurred "in connection with" the bonds (<u>Exhibit</u>
7: Collateral Agreement, subpara. "a") and, more particularly, in "procuring
. . . the discharge of such bonds".  (<u>Exhibit</u>  6:  Gen Ind Agmt, at 3).

It ill behooves the claimants here to complain about such charges.  They had
years to obtain the requisite releases, but did not do so.  Had Brookmar done so, of
course, it would have lost Bay Property's variance and permits to proceed and also

likely have rendered the project less attractive to potential investors or a potential

buyer. So Brookmar postponed getting the bonds released, thereby enabling its sale to

Westshore. And, as for Beach, Beach tried to cut corners, with lawyer's arguments

instead of the contractually required documents. So it was left to Universal to deal with

the problem, which it did by filing this action.

The City's post-litem release of the bonds resolved only one problem; there were

others.

Another problem was that Universal was confronted with competing claims to

the collateral - - Bay Property, on one side, Brookmar and its stalking horse Beach on

the other.

Here, too, the problem might have been avoided but the contractual protocols

designed to avoid just such problems had not been followed. The collateral receipt

Universal gave Bay Property contains the following provision:

> Upon receipt of written evidence satisfactory to Surety of
> its discharge from all liability under such bonds, and of
> ownership of the collateral security by the applicant (it being
> recognized that differences of opinion with regard to proof
> of ownership and of termination of liability, require to
> giving of considerable latitude to Surety in the
> determination of what evidence is reasonable), and of
> payments of all amounts due as provided herein, Surety
> shall, within a reasonable time, return said collateral security
> or the proceeds thereof, less any deductions pursuant to the
> terms of this agreement to the party then designated as
> Owner. THIS RECEIPT IS NOT ASSIGNABLE OR
> TRANSFERABLE EXCEPT UPON CONSENT OF A DULY
> AUTHORIZED OFFICER OF SURETY, AND MUST BE
> RETURNED UPON SURRENDER OF THE COLLATERAL
> SECURITY. (Emphasis in original)

31

Satisfactory written evidence of the transfer of ownership of the Bay Property collateral was never given to Universal. And Bay denied there had ever been any transfer. (Docket #26 : Bay Answer).

Here again, Brookmar and Beach contended (and still contend) that the contractual protocols could be side-stepped. They argue that the sale of the real property somehow carried with it "title" to the surety bonds and "rights" to Bay Property's collateral - - as though the bonds and collateral were "fixtures" or "emblements" that go with the land. That argument makes less sense than buying a re-possessed auto from a dealer and claiming "title" to the former owner's auto insurance and "rights" to any refunds from the insurer.

As written "proof" of transfer, Beach produced the agreement whereby Chase evidently obtained a $950k escrow deposit from Brookmar (after Brookmar refused to procure the release of the Chase LOC). But we find nothing in that agreement purporting to transfer rights to Bay's collateral. Nor was Bay a signatory.

We did find on our own (in Universal's file) a letter from Chase to the effect that (as far as Chase was concerned at any rate) any collateral refund could go to Brookmar. (Exhibit 36) The letter hardly met the protocols for a formal assignment, notably lacking any consent from Bay, who in fact disagreed (and pointed out that Chase has a strong motive to tell Universal to pay Brookmar, so Chase itself wouldn't have to disgorge some of that $950k Chase got from Brookmar).

More fundamentally, Chase could not dispose of the collateral if the collateral

32

belonged to Bay or Eichner. And since Eichner testified that he gave Chase $650k for the $500k LOC, and since Eichner was the "applicant" for the LOC, Eichner, personally, was entitled to be equitably subrogated to Bay's rights to any refund, a point codified in NY UCC §5-117(b).

Accordingly, Universal also sought a declaratory judgment to resolve the competing claims to the collateral. Fees and expenses thereby incurred are due Universal pursuant to the provision (Exhibit 7: Collateral Agreement, subpar "d") that the collateral is also security for "attorney's fees in connection with any claim to the collateral security by persons claiming adversely to Owner [i.e., Bay Property]."

The competing claims were resolved only post litem, by a sharing agreement between Bay and Beach, to split the proceeds. [Docket # 47].

That brings us to the next set of disputes, disputes over the amount of any refund. Beach disputes Universal's right to deduct for unpaid premiums. (See Point I, above). And Beach demands interest, on top of the amount of collateral being held. (See Point II).

For litigating these disputes, created by Beach, Universal is entitled to its counsel fees and expenses incurred to recover unpaid premiums (Exhibit 6 : Gen Ind Agmt, art 3), to recover its expenses (Ibid), and to vindicate its rights under the General Indemnity Agreement (Id, subpara "E").

And until it has been "fully reimbursed for all loss and expense", and paid for all premiums, the collateral may be held by Universal, as security. (Exhibit 6 : Gen Ind

33

Agmt, art 6; Exhibit 7:  Collateral Agmt, subpara "6").

Because the amount of such fees and expenses cannot be determined until the end of this case, provision should be made for an assessment by the court at that time.

## Conclusion

This Court should issue a declaratory judgment disallowing claimant's claim for interest or investment income and allowing charges against the collateral for the unpaid bond premiums and for Universal's attorneys' fees and expenses, and set the matter down for an assessment to determine the exact amounts.

**Dated**: New York, New York
February 28, 2011

Respectfully submitted,
**Zichello & McIntyre, LLP**
Attorneys for Plaintiff, Universal
Bonding Insurance Company

By:

**s/**_____
Vincent J. Zichello (VZ 3487)
Office & P.O. Address
60 East 42nd Street
New York, NY 10165
Tel. 212-972-5560
E-mail zimc@msn.com

34